IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 13, 2004 Session

## ROBERT WILLIAM ARNDTS, BY CONSERVATOR, CAROL ZELIFF, DARRELL R. SMITH, v. VIOLET A. BONNER AND TOMMY L. RAINES

**Direct Appeal from the Chancery Court for Bradley County**
**No. 01-390     Hon. Jerri Bryant, Chancellor**

---

**No. E2003-02257-COA-R3-CV Filed July 7, 2004**

---

Action was filed by plaintiff's Conservator to recover assets transferred by his wife prior to her death. The Trial Judge awarded certain assets to plaintiff and plaintiff appealed.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Chancery Court Affirmed.**

HERSCHEL PICKENS FRANKS, P.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., J., and H. DAVID CATE, SP.J., joined.

Lyn Dechman, Chattanooga, Tennessee, for Appellant.

B. Prince Miller, Jr., Cleveland, Tennessee, for Appellees.

## OPINION

This action was filed by Robert Arndts, by Conservator, seeking to void transfers of certain assets made by his late wife, Gladys, to her children before her death. The defendants, Violet Bonner and Thomas Raines, are the natural children of Gladys and the stepchildren of plaintiff. Plaintiff alleged that Gladys knew she had an inoperable brain tumor and made transfers of cash, CD's, a car, and realty to her children before her death on December 1, 2001. Plaintiff alleged that as a result of these transfers, he was left without assets except his social security and retirement, and that he was in a nursing home, and had no means to pay for the same, and had been denied Medicaid due to the transfer of assets. Plaintiff further alleged that defendants acted in concert with Gladys in violation of Tenn. Code Ann. §71-6-120, and sought compensatory damages and attorneys fees.

Plaintiff attached a copy of his marriage certificate, showing that he and Gladys were married in October 1980, and attached a copy of a deed showing that Gladys had deeded property on Old Parksville Road to her children. Various bank documents showing jointly held property with his wife were also attached.

Defendants answered and basically denied plaintiff's allegations, and averred that the property at issue was not marital or was not subject to distribution upon Gladys' death as alleged in the Complaint.

Plaintiff's Conservator, Carol Zeliff, testified she was Mr. Arndts' daughter, that Arndts had been in the nursing home since April 2001. She testified that she had been notified that Gladys had an inoperable brain tumor in October, and had been placed in hospice. The Conservator testified that her father had an income of $2,760.00 per month, and that the private pay charges at his nursing home were about $3,150.00 per month. She testified that she applied for Medicaid for her father, but was told that he was disqualified due to improper transfer of his assets. She testified she closed two small bank accounts her father had held jointly with Gladys at First Citizens Bank, and that one contained $66.00 and the other contained $104.00, and that she used this money for her father. She testified that her father and Gladys owned two cars, a 1996 Mercury Sable and a 1987 Chevy van. She testified that the Sable was transferred to Ms. Bonner.

On cross-examination, the Conservator admitted that her father had not been able to drive a car for at least five years, and that her father did receive approval for Medicaid on December 12, 2001.

Gena Near testified that she was employed by First Citizens Bank, as senior customer service representative, and that in October 2001, the bank received a notarized letter from Gladys stating that she was ill and that her daughter would be taking care of her financial business. Near testified that the letter instructed the bank to allow Bonner to cash out CD's and put the money into a savings account in the names of Gladys, Ms. Bonner, and Mr. Raines, which they did. The bank also received a power of attorney document.

Near testified that six CD's jointly held by Mr. and Mrs. Arndts were cashed out by Violet Bonner acting as attorney in fact for Gladys. The cash received for these CD's totaled $15,407.97. This money was deposited into an account (hereinafter "account #25") which was held by Gladys, Ms. Bonner, and Mr. Raines. Account #25 was opened on September 5, 2001, with an initial deposit of $14,355.19.

Near testified that Mr. and Mrs. Arndts had a savings account in both of their names (hereinafter account #43). Near testified that the balance of that account was $14,355.19, and that this money was transferred into account #25 when it was opened. Near testified that account #25 was later closed and the balance of $42,797.80 was withdrawn, but she did not know who closed it. Near testified that a cashier's check for the balance was issued to Violet Bonner or Tommy Raines.

Near further testified that Mr. Arndts's name was on two checking accounts in September 2001, (hereinafter referred to accounts #54 and 61). She testified that both account #54 and account #61 were held in the names of Mr. or Mrs. Arndts or Violet Bonner, and that Bonner was added to both accounts in March of 2001.

Near testified that a check for $10,000.00 was written on account #54 on October 25, 2001, and their records did not show where the money went. She said that account #54 was closed in November by a withdrawal of the remaining balance of $66.93 by Ms. Zeliff.

Near testified that account #61 had a $20,000.00 check written on it in June 2001, but their records did not show to whom the check was written. She said that account #61 was closed in November by Ms. Zeliff, and the remaining balance of around $100.00 was withdrawn.

Near testified that the only account which remained open when Gladys died was a checking account in her name along with either Ms. Bonner or Mr. Raines, which contained $245.94 at the time of trial.

The next witness, Beverly Mayfield, testified that she worked for First Tennessee Bank, and that Gladys had 4 CD's at First Tennessee in November 2001. Three of those CD's were held jointly with her sisters, and were for $10,000 each. Mayfield testified that Gladys' sisters eventually got the money from these CD's, and Gladys also had a $20,000.00 CD which was held jointly with Ms. Bonner and Mr. Raines. She testified that this CD did not appear to have been set up with rights of survivorship, but this CD was cashed on December 12, 2001, by Ms. Bonner and Mr. Raines.

Mayfield testified there was also a checking account opened in October 2001 with a $10,000.00 initial deposit, which was held by Gladys, Ms. Bonner and Mr. Raines, and that the $10,000.00 initial deposit was made by check from First Citizens Bank, which indicated that it came from account #54. Another deposit was made by cashier's check from First Citizens for $34,734.52. That same amount was then withdrawn on December 12, 2001, by cashier's check to Ms. Bonner or Mr. Raines. The remaining funds in the account were withdrawn on January 14, 2002, and cashier's checks were made to Ms. Bonner and Mr. Raines.

After hearing numerous other witnesses, and at the conclusion of the proof, the Court discussed that the elements of fraudulent intent had been considered and there was no intent to defraud Mr. Arndts when the real property was conveyed, because he had no interest in same. The Court found that Mrs. Arndts gave the Mercury Sable to Bonner because she wanted her to use it to take her for treatments, and there was no intent to defraud in that transfer. The Court found that the van was now Mr. Arndts' property, as it had been titled jointly.

The Court held the $10,000.00 cashier's check and the $34,734.00 in the First

Citizens account, which came from the cashing of the CD's, were transferred without consideration and was close in time to Mrs. Arndts' death. She held the source of the funds was from both parties, and found that Mr. Arndts was not provided for by will and ordered those funds to be paid back to Mr. Arndts.

Defendants filed a Motion for Alteration or Amendment of Judgment, asserting that three of the CD's that were cashed out and which constituted part of the $44,000.00 ordered to be returned to Mr. Arndts were always owned by Mrs. Arndts with her children, and Mr. Arndts had no ownership interest in same. Defendants also asserted that account #54 was identified as joint, but was treated during the marriage as Mrs. Arndts's sole property, and only contained funds from her social security checks. Defendants further asserted that the initial deposit of $14,355.00 which was put into the account Mrs. Arndts opened on September 5, 2001 and titled to herself and her children (which was part of the $44,000.00 judgment) came from life insurance proceeds Mrs. Arndts received when her son died, and that the transfer occurred before Mrs. Arndts knew she was ill.

Responding to these Motions, the Trial Court found that the three CD's that did not have Mr. Arndts' name on them were not fraudulently transferred, and thus sustained the motion as to those. The Court also found that the account #54 was a joint account held in both names, and overruled the motion with regard to that account. The Court further found that the transfer of $14,355.00 made on September 5, 2001, was not fraudulent, and should not be returned to Mr. Arndts.

Plaintiff then appealed from the Final Judgment.

The issues presented on appeal are:

1.     Whether the transfers of the jointly and/or individually held property should be voided pursuant to Tenn. Code Ann. §31-1-105 as fraudulent conveyances?

2.     Whether the transfers of such property were made to defeat Mr. Arndts' elective share?

3.     Whether defendants violated Tenn. Code Ann. §71-6-120 (elder abuse and exploitation statute) by assisting in asset transfers, and should be held liable for damages and attorney's fees pursuant to the statute?

The assets which appellant appears to be seeking are as follows:[1]

---

[1] Appellant also raises an issue regarding the CD's that Mrs. Arndts held jointly with her sisters, which contained money that was given to them by their mother. Appellant did not raise this issue at trial, however, and it cannot be raised for the first time on appeal. Further, Mrs. Arndts'

1) $14,355.00 which was taken from joint savings account and put into account titled to Mrs. Arndts and her children on September 5, 2001;

2) Real property owned by Mrs. Arndts and deeded to children in October 2001;

3) Mercury Sable automobile;

4) $20,000.00 which was taken from account #61 by way of cashier's check in June 2001, and purportedly used to open $20,000.00 CD at First Tennessee in August 2001, and

5) Three CD's owned by Mrs. Arndts, which did not have Mr. Arndts' name on them.

The Trial Court's Amended Judgment awarded Mr. Arndts $17,531.26, and appellees have not appealed this award.

Tenn. Code Ann. §31-1-105 provides:

Any conveyance made fraudulently to children or others, with an intent to defeat the surviving spouse of the surviving's spouse distributive or elective share, is, at the election of the surviving spouse, includable in the decedent's net estate under § 31-4-101(b), and voidable to the extent the other assets in the decedent's net estate are insufficient to fund and pay the elective share amount payable to the surviving spouse under § 31-4-101(c).

Pursuant to Tenn. Code Ann. § 31-4-101, Mr. Arndts would be entitled to an elective share of 40% of Mrs. Arndts' net estate due to the length of their marriage.

The factors to consider in determining whether a conveyance is fraudulent are:

1) whether the transfer was made with or without consideration,

2) the size of the transfer in relation to the decedent's total estate,

3) the time between the transfer and the death of the decedent spouse,

4) relations which existed between the husband and wife at the time of the transfer,

---

sisters received this money, and they were not made defendants to this action. Thus, this issue is without merit.

5) the source from which the property came,

6) whether the transfer was illusory, and

7) whether the surviving spouse was adequately provided for in the will.

*Finley v. Finley*, 726 S.W.2d 923 (Tenn. Ct. App. 1986). In such cases, the facts and circumstances of the given case control. *In re Estate of Parsley*, 864 S.W.2d 36 (Tenn. Ct. App. 1988). The Court is required to determine whether there is a fraudulent intent since "intent to defeat the rights of the surviving spouse must be found to exist at the time of the transfer in order to make the statute applicable." *Warren v. Compton*, 626 S.W.2d 12, 17 (Tenn. Ct. App. 1981).

As to the $14,355.00 which was taken from a joint savings account and put into an account titled to Mrs. Arndts and her children on September 5, 2001, the Court initially ordered these monies to be returned to Mr. Arndts, but later amended the judgment, stating that it was "not a transfer in violation of the statute". Taking into account the above factors, the evidence supports the Trial Court's ruling on this issue. The factor which weighs in plaintiff's favor is the transfer was made without consideration and came from joint funds. However, other factors favor defendants in that the size of the transfer was just a small portion of decedent's total estate at the time, and that the Arndts had a good relationship and she was taking care of him daily. The transfer was made within a few months of her death, but well before she knew or had reason to know that she was terminally ill, and the transfer was not illusory .*See Warren v. Compton*, 626 S.W.2d 12, 19 (Tenn. Ct. App. 1981).(for a discussion of illusory).

The proof regarding this transfer was that Mrs. Arndts' sister advised her to put the money into an account titled to Mrs. Arndts and her children, because Mr. Arndts was in the nursing home and would not be able to handle financial transactions, and Mrs. Arndts might in the future need her children to be able to pay bills, etc. There is no proof that she had an intent to defeat Mr. Arndts' rights as a surviving spouse. We affirm the Trial Court's ruling on this issue.

Regarding the real property Mrs. Arndts deeded to the children in October 2001, the evidence shows that Mrs. Arndts owned said real property prior to her marriage to Mr. Arndts and was titled solely in her name. Mr. Arndts brought no real property into the marriage. The couple lived in a mobile home on Mrs. Arndts' property and her son lived in the house on the property, until approximately 2-3 years before Mrs. Arndts' death, when the couple moved into her mother's house "in town". Arndts signed a Quitclaim deed relinquishing any interest he might have in the property in March 2001, and the evidence shows that the parties always treated this property as belonging to Mrs. Arndts.

The Trial Court considered the factors set out in *Finley* and found that since this property belonged solely to Mrs. Arndts, and since Mr. Arndts brought no property into the marriage and disclaimed any rights to this property in March 2001, that there was no intent to defraud Mr.

Arndts of the property by this transfer. The evidence does not preponderate against this ruling.

The proof as to the Mercury Sable automobile was that it was originally registered in both Mr. and Mrs. Arndts' names, and was transferred by Mrs. Arndts to Ms. Bonner in late October 2001. Ms. Bonner testified that she found this car for her mother through her job at an insurance company, helped her mother purchase it, and later used it to transport her mother for her treatments at her mother's request, because her mother had trouble getting in and out of Ms. Bonner's SUV. Ms. Bonner testified that her mother wanted her to have the car as a gift, because Ms. Bonner took a leave of absence from work to take care of her mother and transport her for treatments. The Court again found that there was no intent to defraud when this transfer was made.

Considering the factors in *Finley*, it appears that there was some consideration for this transfer, and the size of the transfer was minimal, and was not illusory, but it was a jointly held asset and was transferred a little over a month before Mrs. Arndts death. As noted, the spouses had a good relationship at the time, and there was no proof that Mrs. Arndts had an intent to deprive Mr. Arndts of the property. Considering the totality of the circumstances, the evidence does not preponderate against the trial court's ruling.

As to the $20,000.00 which was taken from account #61 by way of a cashier's check in June 2001, and purportedly used to open $20,000.00 CD at First Tennessee in August 2001, the Trial Court properly found, there was simply insufficient evidence to show the origin of the money. The bank records did not show who had withdrawn the money, and the record did not establish the source of the $20,000.00 which purchased the CD in August. The evidence does not preponderate against the Trial Court's ruling on this issue.

Finally, as to the three CD's which did not contain Mr. Arndts' name, and were cashed and deposited in an account to Mrs. Arndts and her children, the Court found there was no intent to defraud with regard to these CD's since they were held jointly by Mrs. Arndts and her children before she ever became ill, and this ownership did not change. This issue is also without merit.

Finally, appellant argues that defendants should have been held liable for damages and attorney's fees pursuant to Tenn. Code Ann. §71-6-120, which provides as follows:

> (b) In addition to other remedies provided by law, an elderly person or disabled adult in that person's own right, or by conservator or next friend, shall have a right of recovery in a civil action for compensatory damages for abuse or neglect, sexual abuse or exploitation as defined in this part or for theft of such person's or adult's money or property whether by fraud, deceit, coercion or otherwise. Such right of action against a wrongdoer shall not abate or be extinguished by the death of the elderly person or disabled adult, but shall pass as provided in § 20-5-106, unless the alleged wrongdoer is a family member, in which case the cause of action shall pass to the victim's personal representative.

*  *  *

(d) Damages shall include compensatory damages and costs where it is proven that a defendant is liable for abuse or neglect, sexual abuse or exploitation as defined in this part or for theft of such elderly person's or disabled adult's money or property whether by fraud, deceit, coercion or otherwise.  Costs shall include reasonable expenses.  In addition, if it is proven upon clear and convincing evidence that abuse or neglect, sexual abuse or exploitation or theft resulted from intentional, fraudulent or malicious conduct by the defendant, a claimant shall be entitled to recover reasonable attorneys' fees.

*  *  *

(e) In addition to the damages described in (d), a defendant may also be found liable for punitive damages in accordance with applicable common law standards.

Appellant pled a violation of this statute in the original Complaint, but the Court's judgment pretermitted this claim.  Apparently, the Trial Court concluded that the claim had no merit.

As to the merits of this claim, it must be noted that the statute expressly talks about "theft" of the elderly person's money by fraud, deceit or other means. These transfers were all made by Mrs. Arndts personally, or at her express direction, and there was no proof that either of these defendants took anything by fraud or otherwise.  We therefore conclude that plaintiff failed to carry the burden of proof on this issue.

For the foregoing reasons, we affirm the Judgment of the Trial Court's and remand, with one-half of the cost assessed to plaintiff and one-half to the defendants.

.

_____
HERSCHEL PICKENS FRANKS, P.J.

-8-